UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MELVIN CROSBY BEY,                        :

     Petitioner

                          :

     v.                        Civil Action No. 08-311 (HHK)

EDWARD F. REILLY, Jr., et al.    :

     Respondents
_____ :

PETITIONER'S TRAVERSE TO THE UNITED STATES
PAROLE COMMISSION'S OPPOSITION TO
PETITIONER'S PETITION FOR A WRIT OF HABEAS CORPUS

Comes now petitioner, Melvin Crosby Bey, and respectfully files his traverse to the Respondents opposition to the petitioner's petition for a writ of habeas corpus. Petitioner avers that the United States Parole Commission's ('the Commission') use of their federal re-parole guidelinesduring petitioner's revocation hearing violated the Ex Post Facto clause of the Constitution. Since the Commission's use of its re-parole guidelines violated the Ex Post Facto clause of the Constitution, petitioner's petition for a writ of habeas corpus should be granted swiftly in the interest of justice.

**ARGUMENT**

I. The Correct and Applicable Rules, and Regulations Relevant to Petitioner's Claim

Petitioner inadvertently stated the incorrect D.C. Board of Parole (Board) regulations (9 D.C.R.R. §103 et seq.) when he intitially filed his petition for writ of habeas corpus. At the time petitioner filed his petition for writ of habeas corpus with the Court he was severely handicapped and at a disadvantage because the law library at the D.C. Jail was wholly inadequate without any law books, looseleaf services or any printed legal materials. Petitioner erroneously misconstrued 9 D.C.R.R. §103 et seq. with 28 DCMR § 103, §204 et seq. (May 1987), which is the applicable and correct Board regulations relevant to the instant case. Rehearings shall be afforded to parole and mandatory release violators whose status was revoked by Board action. In considering where in a range to order a rehearing scheduled, the Board may consider mitigating and aggravating factors of the violations..............................

RECEIVED
JUN 26 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

which may include the nature of a new offense, the length of time on parole, and the overall adjustment on parole. The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked solely on the basis of technical violations shall ordinarily be held from **six (6)** to **nine (9)** months from the last Board action. See 28 DCMR § 103.7, appended as Ex.___A___.

PROCEDURES FOR GRANTING PAROLE

After determing which risk category applies to a parole candidate, the Board shall consider the folowing pre and post incarceration factors to determine whether a candidate should be granted parole:
(a) Whether the current offense involved a felony in which the parole candidate caused, attempted to cause, or threatened to cause death or serious bodily injury to another individual;
(b) Whether the parole candidate has two (2) or more previous convictions for a felony of the nature described in § 204.18 (a);
(c) Whether the parole candidate has ever been convicted of a crime of violence (as defined in §23-1331 (4), D.C. Code (1981 Ed.) while under the influence of PCP;
(d) Whether the current offense involved a felony in which the parole candidate;
(e) Whether the parole candidate has two (2) or more previous convictions for a felony of the nature described in § 204.18 (d)'
(f) Whether the current offense involved a felony conviction under the D.C. Uniform Controlled Substance Act for distribution or intent to distribute illicit substances;
(g) Whether the parole candidate has two (2) or more previous convictions under the D.C. Uniform Controlled Substance Act;
(h) Whether the parole candidate has committed serious disciplinary infractions (adjudicated under the Department of Corrections due process procedures) while under confinement for the current offense; and

(i) Whether the parole candidate has demonstrated sustained achieve-
ment in the area of prison programs, industries, or work assign-
ments while under confinement for the current offense. 28 DCMR §
204.18, attached as Ex. A .

        In 1998, the Commission took over the function of parole
release decision-making from the Board and made use of its authori-
ty to 'amend and supplement' D.C. parole regulations. For revoked
parole violators the Commission uses guidelines at 28 C.F.R. §2.20
§2.21. See 28 C.F.R. §2.81.

        Pursuant to the guidelines at §2.20 and §2.21 the Commission
determines a parole prognosis using the **salient factor score.** An
evaluation sheet containing a "salient factor score' serves as an
aid in determining the parole prognosis (potential risk of parole
violation). See §2.20 (e). Under the reparole consideration guide-
lines for "administrative violations", the Commission has a range
of sanctions available for dealing with administrative parole vio-
lations: reprimand, special conditions (e.g., a CCC placement),
and revocation. The Commission prefrence is to use **reimprisonment**
as a last resort. See §2.21.01

        In determining whether an eligible prisoner should be be
paroled, the Commission shall apply the guidelines set forth in
this section (§2.80(b)). The guidelines assign numerical values
to pre and post-incarceration factors. Decisions outside the guide-
lines may be made where warranted, pursuant to paragraph (n) of
this section. The prisoners Salient Factor Score is used to assist
the Commission in assessing the probability that an offender will
live and remain at liberty without violating the law. The prison-
er's record of criminal conduct (including the nature and circum-
stances of the current offense) shall be used to assist the Comm-
ission in determining the probable seriousness of the recidivism
that is predicted by the Salient Factor Score. See §2.80(c).

-3-

The factors that warrant a decision below the guidelines include, but are not limited to, the following: (i) Better parole risk than indicated by salient factor score. The offender is a better parole risk than indicated by the salient factor score because of: 1. A substantial crime-free period in the community for which credit is not already given on the Salient Factor Score; and 2. A change in the availability of community resources leading to a better parole prognosis.

In reference to "Reparole Decisions", if the prisoner is not serving a new, parolable D.C. Code sentence, the Commission's decision to grant or deny reparole on the parole violation term shall be made by reference to the reparole guidelines at §2.21. The Commission shall establish a **presumptive** or **effective** release date pursuant to §2.12(b).

The Commission rarely sets an 'effective date' of reparole for parole violations. An effective date of parole may be granted up to nine (9) months from the date of the hearing. See §2.82. Respondents concede that, the United States Parole Commission (USPC) guidelines per se, the salient factor score, does not incorporate post-imprisonment program performance as an item in the guidelines. To the same effect, neither does the guidelines incorporate any rehabilitative achievements that a parolee accomplishes in the community.

-4-

## II. Respondents Have Unlawfully Inflicted Increased Punishment Upon Petitioner

Laws that enhance the punishment and inflict a greater punishment than the law at the time the offense was committed violates the Ex Post Facto clause of the Constitution. Johnson v. United States, 529 U.S. 694, 699(2000); Collins v. Youngblood, 497 U.S. 37, 43 (1990). In several cases, retroactive changes in parole laws does violate the Ex Post Facto clause of the Constitution. See, Garner v. Jones, 529 U.S. 244, 250, 120 S. Ct. 1362 (2000), citing, Lynce v. Mathis, 519 u.S. 433, 445-446, 117 S. Ct. 891 (1997), citing Weaver v. Graham, 450 U.S. 24, 32, 101 S. Ct. 960 (1981).

The question in an ex post facto claim in a parole case is whether the change in the parole law, when retroactively applied, has made an offender's punishment "more harsher." The inquiry is whether the retro-active application of the changed rule created "a significant risk of increasing the punishment attached to the crime." Garner, supra, 529 U.S. at 250. A court reviewing an ex post facto claim must first ex-amine whether the challenged parole law, "by its own terms, show[s] a significant risk" of increased punishment for the offender. Id. at 255.

Garner outlines two ways in which "significant risk" can be estab-lished by a petitioner. First, it can be established if there are fac-ial distinctions between the 'old' and 'new' parole/reparole regulat-ions. Second, " when the rule does not by its own terms show a signifi-cant risk," a claimant may also meet his burden "by [introducing] evi-dence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." Garner, 529 U.S. at 255, 120 S. Ct. 1362 (emphasis added); Fletcher v. Reilly, 433 F.3d 867, 877 (D.C. Cir. 2006).

The controlling inquiry "is one of practical effect." Fletcher II, 391 F.3d at 251. A district court must assess the magnitude of the risk in terms of the practical effect of the change in regulations on the length of a petitioner's incarceration. On their face, the federal reparole regulations applied in petitioner's case are substantially different from the D.C. Board's regulations that were repealed in August 2000.

Prior to the Commission's adoption of new regulations, parole and reparole determinations for D.C. Code offenders were guided by the D.C. Board's regulations. See D.C. Mun. Regs. tit. 28 §100 et seq. (1987). At D.C. Board reparole hearings, release decisions were based on the same criteria used in connection with parole determinations. D.C. Mun. Reg. tit. 28, §204.1 To "determine whether an incarcerated individual would be paroled or reparoled, the D.C. Board employed an analytic framework that relied on both pre and post-incarceration factors.

The Board would first consider the following pre-incarceration factors: prior convictions and adjudications, prior commitments of more than 30 days, age at commisssion of current offense, recent commitment free period, status of prisoner at time of current offense, and history of heroin or opiate dependence. D.C. Mun. Regs. tit. 28 § 204.4-204.16. The pre-incarceration factors were then weighed by a formula to determine the candidates risk category, called a "salient factor score." D.C. Mun. Regs. tit. 28 §204.17 and Appendix 2-1. The Board would then consider pre-and post incarceration factors to determine whether the candidate should be reparoled. D.C. Mun. Regs. tit. 28 §204.18. Two post-incarceration factors in particular were important: institutional behavior and "sustained achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." D.C. Mun. Regs. tit. 28 §204.18 (h)-(i).

-6-

These factors, along with a second set of pre-incarceration fac-
tors, were then integrated into a calculus to produce a point score
which constrained the Board's discretion in making final reparole de-
terminations. See D.C. Mun. Regs tit. 28 §204.19 and Appendix 2-1.
At rehearings the Board would take the original "total point score
from the initial hearing and adjust that score according to the insti-
tutional record of the candidate since the last hearing pursuant to
Appendix 2-2." D.C. Mun. Regs. tit. 28, §204.21.

The D.C. Board regulations plainly evidence a **rehabilitative**
focus in making parole and reparole determinations. Post-incarcera-
tion factors were formally integrated into release determinations.
This is different from the current federal regualtions singular focus
on pre-incarceration factors. See Cosgrove v. Thornburgh, 703 F. Supp.
995, 1003-04 (D.C.C. 1988) (finding that the Board utilized both pre-
incarceration and post-incarceration factors in making parole suit-
ability determinations, whereas "the Commission uses only two pre-
incarceration factors, thus de-emphasizing any rehabilitative results
from incarceration").

Neither the salient factor score nor the offense severity cate-
gory takes into account petitioner's post-release productivity, i.e.,
various types of employment and enrollment in a higher education pro-
gram. Neither of these rehabilitative achievements were formally
weighed by the Commission in its reparole decision. Petitioner's post-
release productivity did not factor into the assessment of either his
reparole eligibility, i.e., the earliest date petitioner may be con-
sidered for reparole or his reparole suitability, i.e., whether peti-
tioner is a good candidate for release.

The Commission's retroactive application of the federal reparole
regulations has increased petitioner's stay in prison, because the
federal regulations determine the appropriateness of reparole based
upon measures that focus solely on pre-incarceration behavior. By
contrast, the D.C. Board's reparole regulations placed significant
weight on institutional conduct and rehabilitative accomplishments.

-7-

Petitioner informed the hearing examiner at his revocation hearing that he was and still is enrolled in school at Penn Foster Career School in the Paralegal Program, which would have been a favorable factor affecting his suitability for reparole inder the D.C. guide- lines. Respondents admit that the federal guidelines, specifically, the 'salient factor score', does not incorporate post-incarceration accomplishments as an item in the guidelines. <u>See Respondents Opposi-</u> <u>tion at pg. 8 fn. 10.</u>

According to a recent Evaluation and Re--Validation of the U.S. Parole Guidelines Risk ("Study") by the JFA Institute, authored by James Austin, Ph.D. and Roger Ocker, and requested by the United States Parole Commission ("USPC") itself, it was determined that the SFS is a **"flawed instrument"**. <u>See Evaluation and Re-Validation of the U.S.</u> <u>Parole Guidelines Risk Instrument</u>, attached as Ex. <u> B </u> . Pursuant to the Study it is stated there under the title "Application of the Sali- ent Risk Factor to Parole Violations" that, "within a severity of the parole violation matrix the difference in months to serve can very well be several years. Under current sentencing practices, the amount of time a parolee can be re-incarcerated for a technical violation can exceed the original sentence. These guidelines do not presume to allow a parolee to be reinstated on parole supervision even for low risk pa- rolees who have violated a low level violation. <u>See Study at pg. 17.</u> The authors of the Study recommended that the USPC should make some of the following policy changes: 1.) Modify the SFS and implement a modified risk instrument as suggested by this study that takes into a number of dynamic factors; 2.) Review its parole revocation grid and allow for shorter periods of incarceration plus the assumption that low risk parolees shall not be reincarcerated for low severity violations; 3.) there should be a concerted effort to reduce the length of imprisonment and parole supervision based on good conduct and completion of programs, allow release at an earlier stage of the sentence, awarding of good-time credits for prisoners who complete rehabilitative programs, and allowing for the period of the parole supervision to be reduced based on good conduct. <u>See Study at pg's.</u> <u>17 & 18.</u>

The D.C. Board guidelines are 'mandatory' guides that constrained the Board's discretion in reparole decisions. See D.C. Mun. Regs. tit. 28 §204.19. The D.C. Board regulations had been importantly different from the federal parole/reparole regulations, because the Board had placed significant weight on post-incarceration behavior, including rehabilitative accomplishments, in making release determinations. Taking this difference into account, the new federal regulations adopted by the Commission mirrored the rehabilitative focus of the Board's former regulations covering **parole**. The Commission, however, did not adopt the Board's regulations covering decisions to grant **reparole** to D.C. Code offenders.

Neither the salient factor score nor the offense severity category takes into account petitioner's post-incarceration/post-release accomplishments. Unlike Fletcher, the Commission did not acknowledge the fact that petitioner is currently enrolled in a Paralegal Program at Penn Foster Career School and that he was working as a Process Server, General Messenger and as an Investigator for a local law firm. See attached Ex.__C__. However, neither of these rehabilitative accomplishments were formally weighed by the Commission in its reparole decision.

Pursuant to the Board rules **mitigating** and aggravating factors of the violations are considered, which may include the length of time on parole, and the overall adjustment on parole. See D.C. Mun. Regs. tit. 28 §103.3.

Respondents alleged in their opposition that, when the Board had jurisdiction over the petitioner, it did not grant the petitioner reparole for four years after his parole was initially revoked. However, respondents have failed to demonstrate any evidence from petitioner's D.C. Board records as to why petitioner was not granted reparole for four years. Petitioner had no infraction reports the entire four years, and had accomplished superior program achievement by assisting Ms. Carolyn Williams, Classification & Parole Officer in establishing the Case Management and Pre-Release Counseling Program at Lorton's Occoquan Facility.

If the court would permit petitioner to file a **discovery** request he could substantiate that the four year set-off time that the D.C. Board imposed was impermissible, arbitrary and capricious, and an abuse of discretion. The controlling inquiry under Garner is how the Board or the Commission exercises discretion in practice, and whether differences between the exercise of discretion in two systems actually "create a significant risk of prolonging [an inmate's] incarceration." Garner, 529 U.S. at 251, 120 S. Ct. 1362.

The Board regulations provided that, "the rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked solely on the basis of technical violations shall ordinarily be held from six (6) to nine (9) months from the last Board action. D.C. Mun. Reg. tit. 28 § 103.7.

Contrary to respondents assertion that under the erroneous Board regulation petitioner would have received a parole rehearing in March, 2009, in fact, under the current Board regulations petitioner would have received a parole rehearing in May, 2008, and no later than August, 2008.

Although the Commission granted petitioner a reparole effective date of November 15, 2008, it was totally impermissible for them to do so. An effective date of parole may be granted up to nine months from the date of the hearing an not twelve months as the Commission did with petitioner. See 28 C.F.R. §2.82(Emphasis added).

As a common practice and rule the Commission routinely gives a parole violator a **presumptive** release date as oppose to an **effective** date of reparole. See Fletcher, 433 F.3d 867, 873. Thus, respondents deliberately granted petitioner an impermissible effective reparole date as a futile attempt to dupe the court and defeat petitioner's writ of habeas corpus.

-10-

Consequently , the application of the Commission's reparole guidelines resulted in a decision that was wholly unfavorable to petitioner in the following ways. Firs the Pre-hearing Examiner, Joseph M. Pacholski had recommended a release after 10 months and not 12 months as Examiner Paul Howard recommended at petitioner's revocation hearing. See Respondents Ex. 8B at pg. 4 (D.C. Local Revocation Prehearing Assessment). Second, the factors that warrant a decision below the guidelines, e.g., substantial crime-free period in the community and a change in the availability of community resources leading to a better parole prognosis was not consider by the Commission. Third, not only did respondents forfeit more than four (4) years of petitioner's parole liberty time, but their agents, the Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas, unlawfuly added twelve (12) years to petitioner's sentence. See Sentence Monitoring Computation Data Sheet, attached as Ex. D .

Petitioner has demonstrated a **prima facie** case that his rights under the Ex Post Facto Clause have been violated, because the facial distinction between the Board's regulations and the federal regulations that replaced them, specifically the fact that the new federal regulations, unlike the Board's regulations, do not take post-incarceration nor post-release behavior into account. Thus, petitioner has made out a viable claim that there is a significant risk that his punishment has been impermissibly increased by virtue of the Commission's retroactive application of the new federal regulations governing parole.

-11-

## CONCLUSION

Based on the foregoing reasons, petitioner has indisputably demonstrated that the use of the Commission's regulations has violated petitioner's rights under the Ex Post Facto Clause of the U.S. Constitution and, therefore, the petitioner's petition for a writ of habeas corpus should be sustained and granted in the fair administration of justice and the cause of this case.

A proposed Order is attached.

Respectfully submitted,

Melvin Crosby Bey
In propria persona

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the Petitioner's Traverse to the Respondents Opposition to Petitioner's petition for a Writ of Habeas Corpus has been mailed, postage prepaid to Sherri L. Berthrong, Assistant United States Attorney, 555 4th Street, N.W., Room 10-450, Washington, D.C. 20530, this 21st day of June, 2008.

Melvin Crosby Bey
In propria persona

-12-

# D C M R

# 28

# CORRECTIONS
# COURTS
## AND
# CRIMINAL
# JUSTICE

★ ★ ★

## D.C. OFFICE OF DOCUMENTS
# MAY, 1987

Exhibit _A_

MARION BARRY, JR.
MAYOR

ALAN S. WINTER
ACTING DIRECTOR OF DOCUMENTS

## 103    REHEARINGS

103.1    A prisoner serving a maximum sentence of less than five (5) years who was denied parole at his or her original parole hearing ordinarily shall be granted a rehearing no later than six (6) months after the Board's last action.

103.2    A prisoner serving a maximum sentence of five (5) years or more who was denied parole at the original hearing ordinarily shall receive a rehearing one (1) year after the last action taken by the Board.

103.3    Rehearings shall be afforded to parole and mandatory release violators whose status was revoked by Board action. In considering where in a range to order a rehearing scheduled, the Board may consider mitigating and aggravating factors of the violations, which may include the nature of a new offense (property crime, crime of violence against person, or victimless crimes), the length of time on parole, and the overall adjustment on parole.

103.4    Rehearings for a violator who has less than five (5) years remaining to be served and whose release was revoked solely on the basis of technical violations of the conditions of release shall ordinarily be held six (6) months from the last Board action.

103.5    The rehearing for a violator who has less than five (5) years remaining to be served and whose release was revoked on the basis of a new misdemeanor conviction or a new misdemeanor conviction and technical violations shall ordinarily be held from six (6) to nine (9) months from the last Board action.

103.6    The rehearing for a violator who has less than five (5) years remaining to be served and whose release was revoked on the basis of a new felony conviction or a new felony conviction and other violations of release shall ordinarily be held from nine (9) to fifteen (15) months from the last Board action.

103.7    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked solely on the basis of technical violations shall ordinarily be held from six (6) to nine (9) months from the last Board action.

103.8    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked on the basis of a new misdemeanor conviction or a new misdemeanor conviction and technical violations shall ordinarily be held from nine (9) to fifteen (15) months from the last Board action.

103.9    The rehearing for a violator who has five (5) or more years remaining to be served and whose release was revoked on the basis of a new felony conviction or a new felony conviction and other violations of release shall ordinarily be held from fifteen (15) to twenty-four (24) months from the last Board action.

103.10    The Board may establish any rehearing date it determines to be proper, regardless of the length of sentence involved or the time remaining to be served.

**204**    PROCEDURES FOR GRANTING PAROLE

204.1    As its criteria for determining whether an incarcerated individual shall be paroled or reparoled, the Board shall use the criteria set forth in this section and Appendices 2-1 and 2-2 to this chapter. These criteria consist of pre and post-incarceration factors which enable the Board to exercise its discretion when, and only when, release is not incompatible with the safety of the community. Any parole release decision falling outside the numerically determined guideline shall be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2.

204.2    The Board shall assign each candidate for parole a salient factor score (SFS) which shall be one of the factors used in calculating parole eligibility pursuant to the provisions of this section.

204.3    The Board shall utilize the SFS as an actuarial parole prognosis aid to assess the degree of risk posed by a parolee.

204.4    For the purposes of calculating the SFS, the Board shall assign a numerical value to each of the following categories:

   (a)  Prior convictions and adjudications;

   (b)  Prior commitments of more than thirty (30) days;

   (c)  Age at commission of current offense;

   (d)  Recent commitment-free period;

   (e)  Status of prisoner at time current offense; and

   (f)  History of heroin or opiate dependence.

204.5    In assigning a SFS numerical value for the factor of prior convictions and adjudications pursuant to §204.4(a), the Board shall count the following:

   (a)  All convictions and adjudications for criminal offenses (except as excluded by §204.6), other than the current offense;

   (b)  Convictions for offenses committed while on bail or probation for the current offense;

   (c)  Juvenile delinquency adjudications except the following:

        (1)  Status offenses (e.g., runaway, truancy, habitual disobedience); and

2-3

**204**     **PROCEDURES FOR GRANTING PAROLE**    (Continued)

204.7     (Continued)

      (b) Prior commitments of more than thirty (30) days imposed upon revocation of probation or parole where the probation or parole resulted from a conviction or adjudication counted pursuant to §204.5.

204.8     Concurrent or consecutive sentences, whether imposed at the same time or at different times, that result in a continuous period of confinement shall be counted as a single commitment.

204.9     Commitments of more than thirty (30) days imposed for an escape, an attempted escape, or for criminal conduct committed while in confinement or escape status shall be counted as a separate commitment.

204.10    A commitment under §204.4(b) means confinement in a jail, prison, juvenile institution, or residential or community treatment center.

204.11    A prior commitment for more than thirty (30) days shall be counted under §204.7(a) despite avoidance of actual confinement through escape or bail pending appeal.

204.12    In assigning a SFS numerical value for the factor of age at commission of the current offense pursuant to §204.4(c), the Board shall, in the case of a parole or probation violator, use the age at the commencement of the conduct constituting the parole or probation violation.

204.13    In assigning a SFS numerical value for the factor of recent commitment-free period pursuant to §204.4(d), the Board shall regard a prisoner's commitment as terminated when he or she is released from confinement status regardless of where confinement occurs.

204.14    In assigning a SFS numerical value for the factor of status of the prisoner at the time of commission of the current offense pursuant to §204.4(e), the Board shall not consider a prisoner to have been on parole or probation if at the time of the commission of the current offense that parole or probation was unsupervised.

204.15    In assigning a SFS numerical value to the factor of history of heroin or opiate dependence under §204.4(f), the Board shall not consider the prisoner to have had a history of dependence if the prisoner had no dependence for the ten (10) year period preceding the commission of the current offense, not counting any time spent in confinement.

204    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.18    (Continued)

(h)  Whether the parole candidate has committed serious
disciplinary infractions (adjudicated under the Department
of Corrections' due process procedures) while under
confinement for the current offense; and

(i)  Whether the parole candidate has demonstrated sustained
achievement in the area of prison programs, industries, or
work assignments while under confinement for the current
offense.

204.19    After determining an adult parole candidate's SFS score and
after applying the pre and post incarceration factors to arrive
at a total point score pursuant to §204 and Appendix 2-1, the
Board shall take one (1) of the following actions:

(a)  IF POINTS = 0:    Parole shall be granted at initial
hearing with low level of
supervision required;

(b)  IF POINTS = 1:    Parole shall be granted at initial
hearing with high level of
supervision required;

(c)  IF POINTS = 2:    Parole shall be granted at initial
hearing with highest level of
supervision required; or

(d)  IF POINTS = 3-5    Parole shall be denied at initial
hearing and rehearing scheduled.

204.20    After determining a youth offender parole candidate's SFS score
and after applying the pre and post incarceration factors to
arrive at a total point score pursuant to §204 and Appendix 2-1,
the Board shall take one (1) of the following actions:

(a)  IF POINTS = 0:    Parole shall be granted at initial
hearing with conditions established to
address treatment needs; or

(b)  IF POINTS = 1-5:    Parole shall be denied at initial
hearing and a rehearing scheduled based
on estimated time to achieve program
objectives established by the
classification team and the Board of
Parole.

## APPENDIX 2-1

### SALIENT FACTOR SCORE

(Used to determine numerical values for parole eligibility criteria pursuant to §204).

Item A:  PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE)........ ☐

      None ................. = 3
      One .................. = 2
      Two or Three ......... = 1
      Four or more ......... = 0

Item B:  PRIOR COMMITMENT(S) OR MORE THAN THIRTY DAYS.............. ☐
      (ADULT OR JUVENILE)

      None ................. = 2
      One or Two ........... = 1
      Three or more ........ = 0

Item C:  AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS................... ☐

    Age at commencement of current offense
      26 years of age or more ............. = 2
      20-25 years of age .................. = 1
      19 years of age or less ............. = 0

    ***Exception:  If five or more prior commitments of more than
    thirty days (adult or juvenile), place an "X" here
    and score this item ................. = 0 _____

Item D:  RECENT COMMITMENT-FREE PERIOD (THREE YEARS), .............. ☐

    No prior commitment of more than thirty days (adult or
    juvenile) or released to the community from last such
    commitment at least three years prior to the commencement
    of the current offense ............. = 1

    Otherwise .......................... = 0

Item E:  PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS ................ ☐
      VIOLATOR THIS TIME

    Neither on probation, confinement, or escape status at
    the time of the current offense; nor committed as a
    probation, parole confinement, or escape status violator
    this time .......................... = 1

    Otherwise .......................... = 0

**APPENDIX 2-1**   (Continued)

Drug Trafficking:  (Continued)

      b.  Does the offender have two or more previous convictions for significantly similar offenses as those described in (3.a) (i.e., convictions under this statute or a similar one in another jurisdiction)?

            — —

## Post-Incarceration Factors

**A.**   INSTITUTIONAL ADJUSTMENT:

    Has this offender committed serious disciplinary infractions (adjudicated under Department of Corrections due process procedures)?

            — —

**B.**   INSTITUTIONAL PROGRAM PARTICIPATION:

    Has this offender demonstrated sustained achievement in the area of prison programs, industries, or work assignments during this period of incarceration?

            — —

### POINT ASSIGNMENT GRID
### ADULT OFFENDERS

Instructions:

1.   Circle the appropriate Salient Factor Score category.

2.   Circle any aggravating or mitigating factors for which a finding has been made.

3.   Within each applicable cell, circle the number of points to be added or subtracted from the baseline point assignment determined by the Salient Factor Score Category.

**APPENDIX 2-1**   (Continued)


WORSE RISK:  (Continued)


...History of repetitive sophisticated criminal behavior;
...Unusually extensive and serious prior record (at least five felony convictions);
...Unusual cruelty to victims.
Specifically: _____

---

BETTER RISK:  NOTE:    Applicable only to offenders not classified as
                       low risks by the Salient Factor Score.


...record resulting exclusively from trivial offenses;
...substantial crime-free period for which credit not already given on the
   Salient Factor Score.
Specifically: _____

---

OTHER PRE-INCARCERATION FACTORS: _____


...This YCA offender would have been exposed to a maximum sentence of ____
   months had he/she been sentenced as an adult;
...Substantial cooperation with the government that has not been otherwise
   rewarded;
...Substantial period in custody on other sentence(s) or additional
   committed sentences.  (NOTE:  This circumstance can also be used as an
   "other change in circumstances" below if a new committed sentence is
   imposed after incarceration on the current offense).
...Other _____

Specifically: _____
_____

POST-INCARCERATION FACTORS: _____


...Exceptional achievement in educational or vocational programs during
   period of incarceration;
...Change in the availability of community resources leading to better
   parole prognosis;
...Poor medical prognosis;
...Other change in circumstances _____

Specifically: _____
_____



# Evaluation and Re-Validation of the US Parole Guidelines Risk Instrument

Submitted by

James Austin, Ph.D.
Roger Ocker

Exhibit _____ *B* _____

# Acknowledgments

A number of individuals contributed to this report.  First, we would like to thank Edward F. Reilly, the Chair of the United States Parole Commission and fellow Commissioners Patricia K. Cushwa and Cranston J. Mitchell for their continued support and assistance throughout the project. James Beck and Mary Anna Portner-Brown helped draw the sample and complete the very detailed data collection effort.  Nancy Ware, Director and Mannone Butler, Legal Advisor and Program Analyst for the D.C. Criminal Justice Coordinating Council provided staff assistance for the inputting of the data as well as overall guidance in the production of this report. Kim Hunt, the Executive Director of the DC Sentencing and Criminal Code Revision Commission provided data on past and current sentencing practices.

Funding for this study was generously provided by the Open Society Institute (OSI). Aurie Hall, Program Officer with the OSI, provided much assistance and support as well.

# Executive Summary

## Major Findings

1. DC prisoners released in 2002 who had been sentenced under the DC code prior to August 2002 as compared to other state prisoners had much longer sentences and serve longer prison terms.

2. About 2/3 (67%) of the cohort were re-arrested at least one time, 52% were re-convicted, and 37% were returned to the custody of the BOP within three years of being released from prison.

3. These recidivism rates are relatively comparable to the most recent recidivism data that were published by the U.S. Department of Justice's Bureau of Justice Statistics (BJS) as well as other states.

4. While 67% of the released prisoners were re-arrested at least once, the average number of arrests (1.9) is much lower than the rate of arrests three years prior to being incarcerated (5.9). In effect they rate of arrests dropped by over 60%.

5. The types of crimes being committed by the released DC prisoners are similar to other states in that the vast majority are non-violent in nature.

6. The non-guideline risk factors that are associated with recidivism are as follows:

   a. Gender – women have much lower rate
   b. Age – younger prisoners have higher rate
   c. Weapon Used in Offense – lower rate
   d. Friends incarcerated – higher rate
   e. History of Substance Abuse – higher rate
   f. Participation in BOP programming – lower rate
   g. Transferred to Community Corrections prior to parole – lower rate
   h. Released to spouse, friend, shelter care – lower rate
   i. Released with Photo ID or Drivers License or SSN – lower rate

7. Consistent with other studies, length of stay is not associated with recidivism.

8. Many of the salient factor items have either weak or non-existent relationships with recidivism.

9. Not surprisingly, the overall scale also has a weak association with recidivism with only the very good risk category showing a difference from the other risk levels.

10. An alternative risk instrument that uses both static dynamic risk factors does a better job of sorting releases by risk level.

11. Once the risk level is determined, another set of computations are made by the USPC staff to determine whether parole should be granted at the initial parole eligibility date or some time thereafter.

12. The vast majority (80%) of cases score "0" months range with the remainder scoring the 12-24 months.

13. These resulting higher ranges (or add ons) are largely based on the severity of the crime or prior criminal record which are not related to recidivism.

14. The SFS is also used to imprison parole violators based on the nature of the violation(s) and SFS score. Within a violation category, the difference in months to serve can vary be several years. Under this practice, the amount of time served for a technical violation can exceed the original sentence.

15. This practice is placing too much emphasis on the SFS as a criteria for revocations – especially given the lack of prediction in the instrument as shown earlier.

# Recommendations

1. Modify the SFS and implement a modified risk instrument as suggested by this study that takes into a number of dynamic factors (with some modification);

2. Discontinue the application of the other guidelines factors being used to enhance presumptive release dates and replace them with a simple offense/risk level matrix;

3. The USPC needs to determine the extent to which it wishes to extend parole eligibility dates based solely on offense severity and history of violence – especially given the long period of incarceration DC sentenced prisoners are now serving and the lack of a relationship between length of time served and recidivism; and,

4. Review its parole revocation grid and allow for much shorter periods of incarceration plus the assumption that low risk parolees shall not be re-incarcerated for low severity violations.

5. On a more generic level, there should be a concerted effort to reduce the length of imprisonment and parole supervision based on good conduct and completion of programs. The current lengths of stay are well above the national averages for similar crimes. Such efforts would include allowing release at an earlier stage of the sentence, awarding of good-time credits for prisoners who complete rehabilitative programs, and allowing for the period of the parole supervision to be reduced based on good conduct.

# Introduction and Background

At the request of the U.S. Parole Commission (USPC) and the Washington D.C. Criminal Justice Coordinating Council (CJCC), the JFA Institute was asked to complete a re-validation of the salient risk factor instrument that is currently being used by the USPC to evaluate the suitability of parole for DC sentenced prisoners (also known as DC Code prisoners).

Prior to the adoption of federal sentencing guidelines in the 1980s and the subsequent introduction of determinate sentencing as described below, the US Parole Board had been using two dimensional matrix (offense severity and risk) to help guide parole decisions for federal prisoners. Each cell in the matrix had a presumptive range for the prisoner to serve prior to being reviewed by the Board. Absent negative institutional behavior or some other documented reasons for not granting parole, it was expected that the Board would release the prisoner based on that range.

This parole guideline system was used for many years until the *Comprehensive Crime Control Act of 1984* was created. Through this legislation, the United States Sentencing Commission was established to set new sentencing guidelines for the federal courts and to replace indeterminate sentencing with a determinate sentencing structure. Under determinate sentencing, prisoners sentenced by the federal courts receive a fixed term and with some exceptions must serve 85% of the imposed sentence. The balance of the sentence is served on post-release supervision as provided by the federal probation officers. Hence, there is no discretionary parole decision within the federal sentencing structure. So, the USPC no longer (with a few exceptions as noted below) has any release authority for federal prisoners.

Within the District of Columbia and as part of the *National Capital Revitalization and Self-Government Improvement Act of 1997,* the DC sentencing structure was changed in August 2000 from an indeterminate to a determinate scheme (similar to the federal guidelines). As part of that reform, the USPC was given some responsibilities that had been under the DC Parole Board which has now been abolished. These responsibilities include release decisions for a declining number of prisoners sentenced under the old indeterminate sentencing structures, the imposition supervision conditions and parole revocation decisions.

Currently, the USPC retained jurisdiction over the following persons.

1. Federal Offenders (offenses committed before November 1, 1987): Granting or denying parole to federal offenders who committed their offenses before November 1, 1987 and who are not otherwise ineligible for parole; and making determinations regarding the initial conditions of supervision, modification of the conditions of supervision for changed circumstances, early discharge from supervision, issuance of a warrant or summons for violation of the conditions of supervision, and revocation of release for such offenders released on parole or mandatory release supervision. Supervision in the community is provided by United States Probation Officers.

*A*

2. <u>D.C. Code Offenders (offenses committed before August 5, 2000)</u>: Granting or denying parole to D.C. Code offenders who committed their offenses before August 5, 2000 and who are not otherwise ineligible for parole; and setting conditions of supervision.

3. <u>D.C. Code Offenders (offenses committed after August 4, 2001</u> The USPC sets the initial conditions of supervision as above for D.C. Code offenders who committed their offenses after August 4, 2001 and who are sentenced to a determinate sentence of imprisonment followed by a term of supervised release. Supervision in the community is provided by Supervision Officers of the Court Services and Offender Supervision Agency (CSOSA) of the District of Columbia.

4. <u>Uniform Code of Military Justice Offenders</u>: Granting or denying parole to parole-eligible Uniform Code of Military Justice offenders who are serving a sentence in a Bureau of Prisons' institution; and setting conditions of supervision as above. Supervision in the community is provided by United States Probation Officers.

5. <u>Transfer-Treaty Cases</u>: The Parole Commission has the responsibility for conducting hearings and setting release dates for U.S. citizens who are serving prison terms imposed by foreign countries and who, pursuant to treaty, have elected to be transferred to the United States for service of that sentence.

6. <u>State Probationers and Parolees in Federal Witness Protection Program</u>: Making determination of initial conditions of supervision, modification and related matters as above for certain state probationers and parolees who have been placed in the federal witness protection program. Supervision in the community is provided by United States Probation Officers.

In performing its release and the imposition of supervision conditions on these various populations, the USPC continues to use the salient risk score instrument. It's important to note that this instrument was developed and normed on the samples of federal prisoners in the 1970s and 1980s. One of the last published articles on the instrument was written by Peter Hoffman and James Beck in 1985. It showed that based on a sample of released federal prisoners, the items and the instrument were predictive of recidivism.[1]

It's noteworthy that a number of versions of the salient factor risk score have been adopted by several states including Washington, Maryland, Ohio, Oregon, Connecticut, and Georgia. Further, the salient factor scale now used by the USPC differs from the one that was used historically by the USPC. For example, earlier versions of the salient factor score had different weights for the scoring items and included a factor that measured heroin and opiate addiction.

The salient risk factor instrument portion of the USPC guidelines instrument consists of a small number set of factors that had been shown to be associated with success or failure

---

[1] Hoffman, Peter and James Beck. 1985. "Recidivism Among Released Prisoners", <u>Criminal Justice and Behavior</u>, Vol. 12, No.4: 501-507.

on parole. In today's jargon, the factors were exclusively static factors that reflected the prisoner at the time of admission. Thus, once the risk level was established either at the time of admission to prison or before the parole hearing, it would not change.

The six items and associated weights used on the USPC salient factor instrument are as follows:

1. *Prior Convictions/Adjudications (Adult or Juvenile)*
   None = 3;  One = 2;  Two or Three = 1;  Four or More = 0

2. *Prior Commitment(s) of More Than 30 Days (Adult or Juvenile)*
   None = 2;  One or Two = 1;  Three or More = 0

3. *Age at Current Offense/Prior Commitments*

| | | |
|---|---|---|
| 26 years or more | Three or fewer prior commitments | = 3 |
| | Four prior commitments | = 2 |
| | Five or more commitments | = 1 |
| 22 - 25 years | Three or fewer prior commitments | = 2 |
| | Four prior commitments | = 1 |
| | Five or more prior commitments | = 0 |
| 20 - 21 years | Three or fewer prior commitments | = 1 |
| | Four prior commitments | = 0 |
| 19 years or less | Any number of prior commitments | = 0 |

4. *Recent Commitment Free Period (Three Years)*
   No prior commitment of more than 30 days (adult or juvenile) or released to the community from last such commitment at least 3 years prior to the commencement of the current offense = 1; Otherwise = 0

5. *Probation/Parole/Confinement/Escape Status Violator This Time*
   Neither on probation, parole, confinement or escape status at the time of the current offense; nor committed as a probation, parole, confinement, or escape status violator this time =1; Otherwise =0

6. *Older Offenders*
   If the offender was 41 years of age or more at the commencement of the current offense (and the total score from Items A-E above is 9 or less) = 1; Otherwise = 0

However, the instrument has never been validated on a sample of released DC prisoners. This is important since the DC prisoner population is quite different from the federal prisoner population especially with regard to commitment offense. The BOP prisoner population is largely a population of prisoners convicted of drug crimes with a large proportion being distribution or conspiracy to distribute. The DC sentenced population is largely an urban and Black population who has been convicted of a more traditional array of crimes one typically finds within a state prison population. In particular, there are greater numbers of prisoners convicted of property, violent and other non-drug crimes.

For these reasons, the USPC wanted a re-validation study completed that would test the validity of the risk instrument and see what, if any, changes should be made to enhance its predictive attributes. The remainder of this report summarizes the research methods, results and recommendations.

# Research Design

A validity test is designed to see how well the risk factors actually predict recidivism. This test is done by drawing a sample of all DC Code offenders who were sentenced to probation or released from prison and tracking them for a period of 2-3 years. The validation sample records the offender attributes or background items (independent variables) that are believed to be predictive of recidivism (the dependent variable). Recidivism can be measured a number of ways but the three major measures are re-arrest, reconviction and re-admission to prison.

In this study, the validation study consisted of a sample of 700 DC Code sentenced prisoners released in 2002 who had a salient risk factor score completed. As suggested above, these prisoners had been sentenced under the old indeterminate sentencing system. Under that system, the sentence consisted of a minimum and maximum sentence. The latter had to be at least three times higher than the minimum. This produced a very large range in sentence length. The SFS was a major factor in determining what proportion of the sentence would be served by the prisoner.

The sample was drawn by the USPC staff. A very detailed data collection form was developed by the USPC staff that was to be used to collected detailed data from the cases files. The actual salient factor score items had to be extracted from the USPC data files, downloaded and key entered into a separate data base. Staff from the CJCC then manually entered all of the data into a data base file that was formatted for SPSS and statistical analysis.

# Analysis

This section of the report summarizes the major analysis and findings associated with the study. The appendix contains more detailed tables which the reader may wish to review as well.

Table 1 summarizes the overall recidivism measures for the 2002 release cohort. There were three measures of recidivism recorded for each released prisoner:

1. Re-arrest with 3 years;
2. Reconvicted within 3 years; and,
3. Returned to prison (BOP) within three years.

As shown in the table about 2/3 of the cohort were re-arrested at least one time, 52% were re-convicted, and 37% were returned to the custody of the BOP. These recidivism rates are relatively comparable to the most recent recidivism data that were published by the U.S. Department of Justice's Bureau of Justice Statistics (BJS) as well as other states. For example, the three re-arrested percentage of 67% is virtually identical to the 68% reported by BJS. The three year re-conviction rate is slightly higher (52% versus 47%)

while the return to the BOP is slightly lower than the BJS 40% rate state. In other words, the recidivism rates of the DC prisoners are relatively typical of other state prison systems.

**Table 1**
**Basic Three Year Recidivism, Length of Stay and Sentence Length Facts**

| Recidivism Measures | Rates |
|---|---|
| Three Year Re-arrest Rate | 67% (68%) |
| Three Year Reconviction Rate | 52% (47%) |
| Three Year Return to Prison (BOP) | 37% (40%) |
| Time served prior to release | 44 months (30 months) |
| Average time to new conviction | 18.2 months |
| Suppression Effect | |
| 3 Years prior to current incarceration | 5.3 Arrests |
| 3 Years after current incarceration | 1.9 Arrests |
| Suppression Effect | -64% |
| | |
| Percent that were non-violent crimes | 83% (86%) |
| Length of Stay Prior to Release | 44 months |
| Sentence length range | 35-71 months |

*Note: Numbers in parenthesis are based on BJS 1994 recidivism rates. (Recidivism of Prisoners Released in 1994. US DOJ. Washington, DC: Bureau of Justice Statistics, 2002) and http://www.ojp.usdoj.gov/bjs/prisons.htm#selected.*

One area where the DC inmates are very different from other state prisoners is the length of time served prior to being released. As shown in Table 1, the average length of stay (or LOS) is 44 months or 14 months more than reported by BJS in its national correctional reporting program. As such, these DC prisoners experienced a much longer period of incarceration than state prisoners. This longer LOS is true even when controlling for the offense a prisoner is sentenced for as shown in Table 2.

**Table 2**
**Sentence and Lengths of Stay by Offense**

| Offense | N | % | Avg. High Sentence (Months) | Avg. Low Sentence (Months) | Avg. Time from Conviction to Release (Months) | Other State Length of Stay (Months)* |
|---|---|---|---|---|---|---|
| Assault | 28 | 4% | 92.8 | 42.8 | 53 | 32 |
| Sex Crime | 9 | 1% | 114.9 | 44.5 | 108 | 81 |
| Robbery | 40 | 6% | 104.9 | 70.8 | 64 | 55 |
| Drug | 286 | 42% | 86.9 | 39.0 | 48 | 23 |
| Burglary | 29 | 4% | 72.3 | 27.9 | 46 | 32 |
| Theft/Fraud | 60 | 9% | 45.2 | 25.2 | 42 | 19 |
| Other non-violent | 29 | 4% | 61.6 | 37.0 | 39 | 16 |
| Probation Revocation | 89 | 13% | 49.2 | 18.5 | 28 | NA |
| Other violent | 83 | 12% | 41.6 | 25.5 | 33 | 24 |
| Weapons | 31 | 4% | 72.0 | 31.4 | 44 | 23 |

*Source: http://www.ojp.usdoj.gov/bjs/prisons.htm#selected

A comparison of the types of crimes for which DC prisoners are sentenced for suggests that that the longer prison time is not explained by the severity of the crime. Table 3 shows the offenses for which the DC prisoners were sentenced for and how they compare to the data provided by BJS for state sentenced prisoners. The major difference is in the drug and property offense categories where the DC prisoners are more likely to be sentenced for a drug crime and less likely for a property crime.

The long lengths of stay for this sample of DC prisoners do not necessarily apply to prisoners now being sentenced under the new determinate sentencing structure. The most recent data from the DC Sentencing Commission show that the average sentence length for prisoners sentenced for drug crimes have declined while sentence lengths have increased for violent crimes.[2] Indeed as shown later on in the report, the current sentence length for some crimes is less than the amount of time for which the USPC can revoke a parolee.

**Table 3**
**Sentenced Offense for DC versus other State Prisons Releases**

| Offense Type | DC | Other States |
|---|---|---|
| Violent | 23% | 27% |
| Drug | 42% | 32% |
| Property | 17% | 28% |
| Weapons | 4% | 3% |
| Other | 13% | 10% |

"Other State" data based on BJS data as reported at tp://www.ojp.usdoj.gov/bjs/prisons.htm#

---

[2] Based on information provided by Kim Hunt, Executive Director, District of Columbia Sentencing and Criminal Code Revision Commission.

Another interesting statistic in Table 1 is a measure of recidivism that is called the suppression effect. This statistic compares the rate of arrest both and pre- and post-incarceration for a similar time frame (in this case three years prior and three years post the current incarceration) to see if the frequency of arrest is changing. Consistent with a few studies that have attempted this calculation, the results here show a sharp reduction in the rate of arrests that was occurring prior to the current incarceration. [3]

Specifically, the average number of arrests three years prior to the current incarceration was 5.3 as compared to the 1.9 average number of arrests post the current incarceration. For a number of reasons (maturation, regression to the mean, program completion, post release supervision, or specific deterrence), it is clear that this cohort is sharply reducing its rate of arrest.

Finally, Table 1 also reports that the vast majority (83%) of the crimes for which the DC prisoners are being re-arrested for are non-violent offenses. This is also consistent with the national recidivism data reported by BJS. Table 4 offers a more detailed breakdown of these crimes data and shows that most of the crimes fall into the non-violent offense category. Especially noteworthy is the large number of "crimes" that appear to be technical violations as they are coded as "parole revocation". Whatever the interpretation of that offense type it adds further evidence that the types of crimes being committed are either property, drug or non-compliance with parole or probation conditions. Again, the types of crimes being committed by the DC prisoners are similar to other states in that the vast majority are non-violent in nature.

**Table 4**
**Type of Re-Arrest Charges**

| Re-arrest Offense | N | % |
|---|---|---|
| Violent Crimes | | 17% |
| Assault | 148 | 11% |
| Sex Crime | 6 | 0% |
| Robbery | 22 | 2% |
| Other violent | 37 | 3% |
| Drug | 313 | 24% |
| Property | 703 | 29% |
| Burglary | 21 | 2% |
| Theft/Fraud | 169 | 13% |
| Other non-violent | 182 | 14% |
| Probation Revocation | 33 | 2% |
| Parole Revocation | 371 | 28% |
| Weapons | 21 | 2% |
| Total | 1,323 | 100% |

---

[3] Austin, J., Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy. *Crime and Delinquency*, Vol. 32, No. 4, October 1986: 404-502.

The next level of analysis assessed the attributes of the 2002 released prisoners as well as the relationships between these attributes and the three measures of recidivism (see Appendix for the detailed tables). In general, this analysis shows that the following attributes are associated with recidivism:

1. Gender – women have much lower rate
2. Age – younger prisoners have higher rate
3. Weapon Used in Offense – lower rate
4. Friends incarcerated – higher rate
5. History of Substance Abuse – higher rate
6. Participation in BOP programming – lower rate
7. Transferred to Community Corrections prior to parole – lower rate
8. Released to spouse, friend, shelter care – lower rate
9. Released with Photo ID or Drivers License or SSN –lower rate

One item that did not show a relationship with recidivism is the amount of the time served. As shown in Table 5, there is no variance in recidivism rates based on how long a person is imprisoned. This means that whether a person is incarcerated for a longer or shorter period, the recidivism rate does not vary.

This statistic has been noted in other research studies including the BJS recidivism reports.[4] It has much importance to DC prisoners who as we have noted have one of the longest lengths of stay in the nation and largely for non-violent crimes. Any reductions in these lengths of stay would have substantial impact on the sentenced prisoner population without any adverse effects on recidivism rates.

**Table 5**
**Length of Stay and Recidivism Rates**

| Length of Stay | N | % | Arrested | Convicted |
|---|---|---|---|---|
| 12 months or less | 37 | 5% | 62% | 43% |
| 13-24 months | 161 | 23% | 68% | 56% |
| 25-36 months | 173 | 25% | 71% | 56% |
| 37-48 months | 108 | 16% | 68% | 51% |
| 49-60 months | 52 | 8% | 83% | 62% |
| 61-120 months | 118 | 17% | 58% | 46% |
| 121 months or more | 29 | 4% | 66% | 48% |

Analysis was also completed on the Salient Risk Score and the associated factors used led by the USPC to render a parole decision. One of the unfortunate discoveries of this study was that the individual items that make up the risk score were not readily available for analysis. It was necessary to print out the available forms that had been completed and were stored in the USPC data system which lowered the sample size to 503 cases.

---

[4] *Recidivism of Prisoners Released in 1994.* US DOJ. Washington, DC: Bureau of Justice Statistics, 2002.

As noted earlier in the report, the risk score consists of six items. These are tallied and then converted to a scale that sorts inmates into the four risk levels. Table 6 shows how the release cohort was scored on each item and the associated recidivism rates. Here, one sees that many of the items have either weak or non-existent relationships with recidivism. Not surprisingly, the overall scale also has a weak association with recidivism with only the very good risk category showing a difference from the other risk levels.

Once the risk level is determined, another set of computations based on six items are made by the hearing examiners to determine whether parole should be granted and after what period of imprisonment. The items:

1. Base point score guideline range (based on the SFS, assessment of violence record, death of victim or other violence associated with the crime);
2. Months to parole eligibility;
3. Disciplinary guidelines prior to last hearing;
4. Superior Program Assignment prior to last hearing;
5. Disciplinary guidelines since last hearing; and,
6. Superior Program Assignment since last hearing.

This must be described as a very complex and difficult computation to understand. It also explicitly re-introduces aspects of the current offense, the prior record and institutional conduct to either mitigate or aggravate the prisoner's expected range of time to serve. There is no other parole board that uses such an elaborate scoring mechanism.

*Superior Program Achievement. If the prisoner received a 2 point reduction for SPA (not ordinary program achievement), subtract 1 x the applicable rehearing range.*

Table 7 shows how this sample of released prisoners has been scored on these factors used to extend or reduce time to serve. Here, one can see that some factors are rarely employed and/or are unrelated to recidivism. The points that are eventually computed to used to develop a range of months one must serve beyond their parole eligibility date.

The vast majority (80%) of cases score "0" months range with the remainder scoring the 12-24 months. What this means is that the prisoners who receive these extended months will have significantly longer periods of confinement than prisoners who either have a lower risk (which is not that predictive), a current or violence offense, or a crime where there was a high level of violence or the victim died. Presumably these are factors that were taken into account with the sentence was imposed by the courts. These resulting higher ranges (or add ons) are largely arbitrary in that there is no scientific rationale behind them. Further, as was noted earlier, there is no difference in the recidivism rates between the "time to serve" ranges.

Based on these findings, an alternative risk assessment instrument was developed. This one relies on the factors that were found to be predictive of recidivism and are separated in to static and dynamic categories. The latter are items recorded at admission that will not change during the course of the prisoner's incarceration. The latter are factors that do change based on time (like age), inmate behavior and program participation. These items and the preliminary set of weights are shown in Table 8. The table also shows that most released parolees have some special condition imposed with the drug condition being the most frequent one applied. Interestingly, parolees who had no special condition imposed had lower recidivism rates.

These factors were then summed and scales according to their predictive attributes. The next result is shown in Table 9. Here, one can see that this system is doing a better job of assessing risk than the current SFS simply because we have eliminated the non-predictive items and added additional ones that are associated with risk.

**Table 7**
**Guideline Factors and Recidivism Rates**

| Item | | % | % with New Conviction | % with Re-arrest |
|---|---|---|---|---|
| Total Cases | 503 | | 52.1% | 66.8% |
| **1. Base Guideline Factors** | | | | |
| **I.  Current or Prior Violence** | | | | |
| Violence current offense + two priors | 1 | 0% | 0% | 100% |
| Violence current offense + one prior | 23 | 5% | 61% | 83% |
| Violent current/firearm current | 122 | 24% | 42% | 60% |
| No violence in current with one prior viol | 67 | 13% | 63% | 79% |
| None | 289 | 57% | 52% | 66% |
| **II.  Death of Victim or High Level of Violence** | | | | |
| Current offense - death of victim | 2 | 0% | 0% | 0% |
| Current offense – attempted death | 1 | 0% | 100% | 100% |
| Current offense – high level of violence | 23 | 5% | 35% | 57% |
| None | 476 | 95% | 52% | 68% |
| **III.  Negative Institutional Behavior** | | | | |
| Assault/weapon/drugs/arson | 2 | 0% | 100% | 100% |
| Other | 16 | 3% | 50% | 75% |
| None | 79 | 16% | 34% | 54% |
| **2.  Program Achievement Prior to Last Hearing** | | | | |
| Ordinary | 53 | 11% | 34% | 51% |
| Superior | 7 | 1% | 14% | 43% |
| None | 37 | 7% | 49% | 73% |
| **3. Disciplinary Impact (adds time)** | | | | |
| Yes | 95 | 19% | 64% | 80% |
| No | 408 | 81% | 48% | 64% |
| **4. Superior Achievement Impact (subtracts time)** | | | | |
| Yes | 52 | 10% | 52% | 65% |
| No | 451 | 90% | 51% | 67% |
| **5. Base Guideline Range** | | | | |
| 0 months | 401 | 80% | 52% | 66% |
| 12-18 months | 56 | 11% | 50% | 75% |
| 18-24 months | 40 | 8% | 48% | 68% |
| 36-48 months | 4 | 1% | 50% | 100% |
| 54 months and above | 2 | 0% | 0% | 50% |
| **Special Conditions** | | | | |
| Drug | 383 | 76% | 54% | 70% |
| Alcohol | 17 | 3% | 65% | 76% |
| Mental Health | 7 | 1% | 57% | 100% |
| Community Corrections Center | 37 | 7% | 27% | 51% |
| No Special Conditions Imposed | 61 | 12% | 40% | 44% |

**Table 8**
**Alternative Risk Instrument**

| Static | PT |
|---|---|
| **Gender** | |
| Male | 2 |
| Female | 0 |
| **Current or prior violent offense** | |
| Violent current w/ firearm | 0 |
| None | 1 |
| Else | 2 |
| **History of Substance Abuse** | |
| Yes | 1 |
| None/unknown | 0 |
| **Prior Jobs Held** | |
| None | |
| Else | |
| **Prior Convictions** | |
| Four or more | 1 |
| Else | 0 |
| **Incident offense** | |
| Assault/sex/prob.revoke/weapons, burglary | 1 |
| Else | 0 |
| Robbery/theft/other violent, drugs | |
| | 0 |
| | 1 |
| | 2 |

| Dynamic | PT |
|---|---|
| **Current Age** | |
| 20 & younger | 3 |
| 21-39 | 2 |
| 40-49 | 1 |
| 51 & older | 0 |
| **Participated in BOP** | |
| Yes | 0 |
| No/unknown | 1 |
| **Transfer to CCC Prior to Release** | |
| Yes | 0 |
| Else | 1 |
| **Released to** | |
| Legal spouse, friend, transitional, shelter, extended family | 0 |
| Else | 1 |
| **Release with Job training** | |
| Yes | 0 |
| Else | 1 |
| **Release with SSN, Photo ID, Driver License.** | |
| No | 0 |
| One of the Above | 1 |
| Two or More of the Above | 2 |
| **Disciplinary impact** | |
| Yes | 2 |
| No | 0 |

**Table 9**
**Alternative Risk Levels and Re-Arrest Rates**

| Risk Level | % of Total | Re-Arrest Rate |
|---|---|---|
| Low | 16% | 33% |
| Moderate | 50% | 54% |
| High | 34% | 65% |

# Application of the Salient Risk Factor to Parole Violations

Related to the use of the SFS on parole release is the application of this instrument to parole revocations. Basically, parolees who violate their terms of parole of supervision are returned to the BOP for a specific period of time. That period of re-confinement is based on a matrix developed by the USPC that weighs the severity of the technical violation(s). Within a severity of the parole violation matrix the difference in months to serve can vary be several years. Under current sentencing practices, the amount of time a parolee can be re-incarcerated for a technical violation can exceed the original sentence. Table 10 shows the average sentence lengths for DC sentenced prisoners by offense type. This is placing too much emphasis on the SFS as a criteria for revocations – especially given the lack of prediction in the instrument as shown earlier.

**Table 10: Average Sentence Lengths In Months by Offense Type 2002-2005**

| Year | Violent | Property | Drug | Weapon | Public Order |
|------|---------|----------|------|--------|--------------|
| 2002 | 124 | 22 | 24 | 13 | 12 |
| 2003 | 127 | 25 | 14 | 20 | 23 |
| 2004 | 109 | 23 | 14 | 12 | 11 |
| 2005 | 122 | 19 | 16 | 10 | 10 |

Source: DC Sentencing and Code Revision Commission

It should also be noted that these guidelines do not presume to allow a parolee to be reinstated on parole supervision even for low risk parolees who have violated a low level violation. In several states such guidelines first determine if the parole needs to be simply sanctioned (sometimes repeatedly) rather than re-incarcerated.

# Recommendations

Based on this study the following policy changes should be considered by the USPC:

1. Modify the SFS and implement a modified risk instrument as suggested by this study that takes into a number of dynamic factors (with some modification);

2. Discontinue the application of the other guidelines factors being used to enhance presumptive release dates and replace them with a simple offense/risk level matrix;

3. The USPC needs to determine the extent to which it wishes to extend parole eligibility dates based solely on offense severity and history of violence – especially given the long period of incarceration DC sentenced prisoners are now

serving and the lack of a relationship between length of time served and recidivism; and,

4. Review its parole revocation grid and allow for much shorter periods of incarceration plus the assumption that low risk parolees shall not be re-incarcerated for low severity violations.

5. On a more generic level, there should be a concerted effort to reduce the length of imprisonment and parole supervision based on good conduct and completion of programs. The current lengths of stay are well above the national averages for similar crimes. Such efforts would include allowing release at an earlier stage of the sentence, awarding of good-time credits for prisoners who complete rehabilitative programs, and allowing for the period of the parole supervision to be reduced based on good conduct.

# APPENDIX TABLES

### Table A-1
### Demographics

| Demographic | N=689 | % | % With Re-arrest (Base=66.8%) | % With New Conviction (Base=52.1%) | Avg. Arrests After Release (Base=1.9) | Avg. Arrests Before (Base=5.3) |
|---|---|---|---|---|---|---|
| **Ethnicity** | | | | | | |
| Black | 658 | 96% | 67% | 53% | 1.9 | 5.4 |
| White | 14 | 2% | 65% | 47% | 1.9 | 6.6 |
| Other | 17 | 2% | 29% | 21% | 0.7 | 2.9 |
| **Sex** | | | | | | |
| Male | 635 | 92% | 68% | 53% | 1.9 | 5.3 |
| Female | 49 | 7% | 51% | 39% | 1.6 | 6.8 |
| **Age at Release** | | | | | | |
| 20 & younger | 124 | 18% | 77% | 56% | 2.2 | 7.5 |
| 25-29 | 120 | 17% | 70% | 49% | 2.1 | 5.0 |
| 30-34 | 118 | 17% | 69% | 53% | 2.0 | 4.9 |
| 35-39 | 113 | 16% | 74% | 60% | 2.2 | 5.8 |
| 40-44 | 94 | 14% | 63% | 51% | 1.7 | 4.7 |
| 45-49 | 63 | 9% | 59% | 51% | 1.5 | 4.5 |
| 50 & older | 46 | 7% | 50% | 41% | 1.0 | 3.2 |
| **Incident Offense** | | | | | | |
| Assault | 28 | 4% | 64% | 43% | 1.2 | 3.0 |
| Sex Crime | 9 | 1% | 67% | 44% | 2.0 | 0.6 |
| Robbery | 40 | 6% | 73% | 58% | 1.9 | 3.7 |
| Drug | 286 | 42% | 57% | 50% | 1.8 | 4.3 |
| Burglary | 29 | 4% | 59% | 52% | 1.8 | 5.0 |
| Theft/Fraud | 60 | 9% | 78% | 63% | 2.6 | 4.9 |
| Other non-violent | 29 | 4% | 76% | 52% | 2.3 | 6.0 |
| Probation Revocation | 89 | 13% | 58% | 47% | 1.8 | 7.0 |
| Other violent | 83 | 12% | 69% | 61% | 2.2 | 10.1 |
| Weapons | 31 | 4% | 61% | 48% | 1.8 | 3.7 |

*Source: BOP sample; note: missing cases excluded*

## Table A-2: Crime Description

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| **Weapon in Offense** | | | | | | |
| None | 95 | 14% | 64% | 55% | 1.7 | 2.8 |
| Firearm | 14 | 2% | 79% | 64% | 1.9 | 5.9 |
| Knife | 537 | 78% | 68% | 52% | 2.0 | 5.9 |
| Other/unknown | 43 | 6% | 56% | 49% | 1.2 | 4.2 |
| **Weapon in Offense/Co-defendant** | | | | | | |
| None | 58 | 8% | 59% | 52% | 1.6 | 2.5 |
| Firearm | 25 | 4% | 72% | 68% | 1.8 | 4.2 |
| Knife | 251 | 36% | 67% | 56% | 1.8 | 5.0 |
| Other/unknown | 355 | 52% | 67% | 48% | 2.0 | 6.1 |
| **Victim - Sexual Abuse/Violence** | | | | | | |
| Yes | 115 | 17% | 68% | 56% | 1.8 | 3.5 |
| No | 545 | 79% | 67% | 51% | 1.9 | 5.7 |
| Unknown | 29 | 4% | 60% | 55% | 1.2 | 4.8 |
| **Immediate Family Members under supervision** | | | | | | |
| Yes | 92 | 13% | 71% | 57% | 2.2 | 6.3 |
| No | 398 | 58% | 67% | 51% | 1.9 | 5.0 |
| Unknown | 199 | 29% | 67% | 54% | 1.9 | 5.6 |
| **Subject Ever Abused** | | | | | | |
| Physically | 23 | 3% | 70% | 61% | 2.6 | 6.0 |
| Sexually | 13 | 2% | 54% | 54% | 1.4 | 6.4 |
| Physically and sexually | 3 | 0% | 67% | 33% | 2.0 | 10.3 |
| None | 573 | 83% | 68% | 53% | 1.9 | 5.1 |
| Unknown | 77 | 11% | 65% | 48% | 1.9 | 6.7 |
| **Gang Affiliation** | | | | | | |
| Yes | 3 | 0% | 100% | 67% | 2.0 | 2.0 |
| No | 231 | 34% | 65% | 50% | 1.6 | 5.0 |
| Unknown | 455 | 66% | 68% | 53% | 2.1 | 5.6 |
| **Drug Use Associated with Offense** | | | | | | |
| Opiates | 27 | 4% | 63% | 59% | 1.3 | 4.6 |
| PCP | 18 | 3% | 72% | 83% | 3.0 | 7.1 |
| Cocaine | 36 | 5% | 72% | 67% | 1.8 | 4.0 |
| Crack | 17 | 2% | 65% | 53% | 1.9 | 4.8 |
| Marijuana | 29 | 4% | 69% | 59% | 1.7 | 6.5 |
| Alcohol | 47 | 7% | 66% | 60% | 1.5 | 5.6 |
| **Friends Incarcerated** | | | | | | |
| Yes | 51 | 7% | 67% | 45% | 1.9 | 4.6 |
| No | 91 | 13% | 51% | 37% | 1.2 | 6.2 |
| Unknown | 547 | 79% | 70% | 56% | 2.0 | 5.3 |

**Table A-3**
**Employment, Education, Substance Abuse History**

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| History of Substance/Alcohol Abuse | | | | | | |
| Yes | 568 | 82% | 68% | 54% | 1.9 | 5.4 |
| No | 44 | 6% | 59% | 39% | 1.8 | 3.3 |
| Unknown | 77 | 11% | 67% | 47% | 1.9 | 6.8 |
| History of Substance use/abuse Treatment Interventions | | | | | | |
| Yes | 195 | 28% | 67% | 54% | 1.8 | 5.0 |
| No | 412 | 60% | 68% | 52% | 2.0 | 5.3 |
| Unknown | 82 | 12% | 65% | 46% | 2.0 | 6.7 |
| Highest Level of Education Completed | | | | | | |
| 8th Grade or less | 67 | 10% | 64% | 57% | 1.9 | 4.9 |
| 9th Grade | 48 | 7% | 71% | 54% | 2.1 | 7.7 |
| Some high school | 291 | 42% | 68% | 55% | 2.0 | 5.1 |
| High school/GED | 200 | 29% | 67% | 48% | 1.8 | 5.0 |
| More than high school | 76 | 11% | 71% | 54% | 2.2 | 6.4 |
| Number of Jobs Held Year Prior to Arrest | | | | | | |
| None | 285 | 41% | 69% | 58% | 2.0 | 5.4 |
| One | 258 | 37% | 65% | 48% | 1.9 | 5.3 |
| Two | 42 | 6% | 69% | 41% | 1.6 | 4.5 |
| Three or more | 5 | 1% | 80% | 60% | 1.8 | 3.0 |
| Unknown | 88 | 13% | 65% | 49% | 2.0 | 7.8 |
| Number of Months Employed Year Prior | | | | | | |
| Always | 111 | 16% | 65% | 44% | 1.8 | 4.6 |
| Never | 178 | 26% | 75% | 61% | 2.2 | 5.4 |
| One to six | 107 | 16% | 66% | 59% | 1.9 | 5.7 |
| Seven to eleven | 52 | 8% | 65% | 40% | 1.7 | 4.3 |
| One year | 144 | 21% | 60% | 48% | 1.7 | 5.3 |
| Unknown | 89 | 13% | 65% | 49% | 2.0 | 6.4 |

**Table A-4**
**BOP Programming**

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| **Participated in BOP Programming** | | | | | | |
| Yes | 592 | 86% | 66% | 51% | 1.9 | 5.0 |
| No | 66 | 10% | 76% | 67% | 2.2 | 8.0 |
| Unknown | 22 | 3% | 75% | 60% | 2.1 | 8.0 |
| **Certificates Earned While In BOP Custody** | | | | | | |
| GED | 90 | 13% | 69% | 57% | 2.0 | 3.1 |
| H.S. Diploma | 7 | 1% | 71% | 71% | 2.6 | 7.7 |
| College | 2 | 0% | 50% | 50% | 1.5 | 4.5 |
| None | 539 | 78% | 66% | 51% | 1.9 | 5.7 |
| **500 Hours or More of Substance Abuse Program** | | | | | | |
| Yes | 60 | 9% | 60% | 58% | 1.5 | 3.2 |
| No | 583 | 85% | 67% | 51% | 1.9 | 5.5 |
| Unknown | 23 | 3% | 71% | 57% | 2.0 | 7.4 |
| **Sex Offender Treatment** | | | | | | |
| Yes | 3 | 0% | 33% | 33% | 1.0 | 0.3 |
| No | 639 | 93% | 67% | 52% | 1.9 | 5.3 |
| Unknown | 23 | 3% | 70% | 67% | 2.0 | 7.0 |
| **Mental Health Treatment** | | | | | | |
| Yes | 20 | 3% | 70% | 55% | 1.8 | 5.3 |
| No | 624 | 91% | 66% | 52% | 1.9 | 5.3 |
| Unknown | 22 | 3% | 70% | 55% | 2.0 | 7.0 |
| **Major Medical** | | | | | | |
| Yes | 34 | 5% | 71% | 59% | 1.7 | 7.0 |
| No | 610 | 89% | 66% | 51% | 1.9 | 5.2 |
| Unknown | 22 | 3% | 70% | 55% | 2.0 | 7.0 |

*Source: BOP sample; note: missing cases excluded*

### Table A-5
### Release History

| Demographic | N=689 | % | % With Re-arrest | % With New Conviction | Avg. Arrests After Release | Avg. Arrests Before |
|---|---|---|---|---|---|---|
| Transfer To Community Corrections Center | | | | | | |
| Yes | 271 | 39% | 62% | 48% | 1.6 | 3.9 |
| No | 289 | 42% | 71% | 55% | 2.1 | 6.3 |
| Unknown | 19 | 3% | 72% | 56% | 2.0 | 6.4 |
| Release to Location | | | | | | |
| Legal spouse | 43 | 6% | 58% | 40% | 1.5 | 4.0 |
| Girlfriend/boyfriend | 69 | 10% | 67% | 54% | 2.3 | 6.1 |
| Parent | 254 | 37% | 72% | 58% | 2.1 | 5.6 |
| Extended Family | 196 | 28% | 65% | 49% | 1.8 | 4.6 |
| Friend | 37 | 5% | 60% | 38% | 1.7 | 5.6 |
| Transitional/shelter | 31 | 4% | 58% | 48% | 1.7 | 4.9 |
| Other | 24 | 3% | 88% | 63% | 2.8 | 6.0 |
| Unknown | 26 | 4% | 69% | 65% | 2.2 | 7.6 |
| Release with Job/Training | | | | | | |
| Yes | 232 | 34% | 62% | 49% | 1.6 | 3.8 |
| No | 415 | 60% | 69% | 53% | 2.1 | 6.0 |
| Unknown | 34 | 5% | 74% | 59% | 2.2 | 7.3 |
| Release with SSN | | | | | | |
| Yes | 242 | 35% | 60% | 47% | 1.5 | 3.6 |
| No | 219 | 32% | 71% | 55% | 2.2 | 6.4 |
| Unknown | 220 | 32% | 71% | 55% | 2.0 | 6.2 |
| Release with Photo ID | | | | | | |
| Yes | 243 | 35% | 60% | 47% | 1.5 | 3.7 |
| No | 218 | 32% | 72% | 55% | 2.2 | 6.4 |
| Unknown | 220 | 32% | 71% | 55% | 2.0 | 6.1 |
| Release with Driver's License | | | | | | |
| Yes | 232 | 34% | 60% | 46% | 1.5 | 3.6 |
| No | 219 | 32% | 71% | 55% | 2.2 | 6.4 |
| Unknown | 230 | 33% | 71% | 56% | 2.0 | 6.1 |

# THE LAW OFFICE OF DARRYL F. WHITE
### 4308 Georgia Avenue, N.W.
### Washington, D.C. 20011

**Telephone**
**(202) 355-2978**

**Facsimile**
**(202) 829-8045**

*Icemanlawyer@msn.com*

January 24, 2008

Ms. Olinda Moyd
Chief, Parole Division
D.C. Public Defender Service
633 Indiana Avenue, NW
Washington, D.C. 20004

Ref:   Melvin Crosby-Bey

Subj:   Reference, Past Employment

Dear Ms. Moyd:

Please note that I have known Mr. Bey since 2002. He has served as a service processor and general messenger that I have used for filing documents at the Courthouse and as an investigator in locating individuals for various Court matters.

He has always been trustworthy and diligence in providing his services to our firm. He has never missed an appointment and has always delivered according to his promises. I can say without hesitation, Mr. Bey's has always taken his work seriously. His attention to detail has been vital in several matters that required litigation.

Overall, I would not have any problem using Mr. Bey's services in the future. I hope this endorsement will help Mr. Bey's situation.

In the event you need anything future, please do no hesitate to contact my office.

Yours,

Darryl F. White

**Exhibit   C**

Revd
5/21/08

```
   RIVCE  540*23 *            SENTENCE MONITORING        *    05-19-2008
PAGE 001           *         COMPUTATION DATA           *    08:01:52
                             AS OF 05-19-2008

REGNO..: 01366-000 NAME: CROSBY, ANTHONY R


FBI NO..........: 377050H           DATE OF BIRTH: 08-16-1954
ARS1............: RIV/A-DES
UNIT............: B                 QUARTERS.....: B01-104L
DETAINERS.......: NO                NOTIFICATIONS: NO

PRE-RELEASE PREPARATION DATE: 10-10-2008

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  11-15-2008 VIA PAROLE

---------------------CURRENT JUDGMENT/WARRANT NO: 010 ----------------------


COURT OF JURISDICTION...........: DIST OF COLUMBIA, SUPERIOR CRT
DOCKET NUMBER...................: 8724-76 (A,C-E)
JUDGE...........................: MURPHY
DATE SENTENCED/PROBATION IMPOSED: 10-06-1976
DATE WARRANT ISSUED.............: 10-21-2003
DATE WARRANT EXECUTED...........: 11-16-2007
DATE COMMITTED..................: 04-16-2008
HOW COMMITTED...................: RETURN OF PAROLE VIOLATOR
PROBATION IMPOSED...............: NO
SPECIAL PAROLE TERM.............:


RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

----------------------CURRENT OBLIGATION NO: 010 ---------------------------

OFFENSE CODE....:  605
OFF/CHG: 22-1801(B),3202 BURGLARY II;22-502,3202 ASSLT W/DANGEROUS WPN
      (2CTS);22-3204 CARRYING A PISTOL WITHOUT LICENSE

 SENTENCE PROCEDURE.............: DC CODE ADULT
 SENTENCE IMPOSED/TIME TO SERVE.:    45 YEARS
 NEW SENTENCE IMPOSED...........: 9468 DAYS
 BASIS FOR CHANGE...............: PAROLE VIOLATOR WARRANT EXEC
 DATE OF OFFENSE................: 08-25-1975




 G0002      MORE PAGES TO FOLLOW . . .
```

**Exhibit   D**

```
   RIVCE  540*23 *            SENTENCE MONITORING          *      05-19-2008
PAGE 002 OF 002 *            COMPUTATION DATA             *      08:01:52
                              AS OF 05-19-2008

REGNO..: 01366-000 NAME: CROSBY, ANTHONY R


------------------------CURRENT COMPUTATION NO: 010 ------------------------


COMPUTATION 010 WAS LAST UPDATED ON 05-09-2008 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 05-09-2008 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010

DATE COMPUTATION BEGAN..........: 11-16-2007
TOTAL TERM IN EFFECT............:  9468 DAYS
TOTAL TERM IN EFFECT CONVERTED..:    25 YEARS      11 MONTHS      2 DAYS
EARLIEST DATE OF OFFENSE........: 08-25-1975

JAIL CREDIT.....................:    FROM DATE      THRU DATE
                                     10-18-2005     10-28-2005
                                     11-15-2007     11-15-2007

TOTAL JAIL CREDIT TIME..........: 12
TOTAL INOPERATIVE TIME..........: 0
STATUTORY GOOD TIME RATE........: 10
TOTAL SGT POSSIBLE..............: 3110
PAROLE ELIGIBILITY..............: COMMISSION'S DISCRETION
STATUTORY RELEASE DATE..........: 03-31-2025
TWO THIRDS DATE.................: N/A
180 DAY DATE....................: 04-08-2033
EXPIRATION FULL TERM DATE.......: 10-05-2033

PAROLE EFFECTIVE................: 11-15-2008
PAROLE EFF VERIFICATION DATE....: 03-27-2008
NEXT PAROLE HEARING DATE........: N/A
TYPE OF HEARING.................: PAROLE EFFECTIVE

PROJECTED SATISFACTION DATE.....: 11-15-2008
PROJECTED SATISFACTION METHOD...: PAROLE

REMARKS.......: FINAL RELEASE AUDIT COMPLETED BY DSCC.



G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MELVIN CROSBY BEY                    :

      Petitioner

                    :

      v.                              Civil Action No. 08-311 (HHK)

EDWARD F. REILLY, Jr., et al.    :

      Respondents

_____ :

## ORDER

    Upon consideration of the Petitioner's Petition for a Writ
of Habeas Corpus, the Respondents Opposition thereto, and Peti-
tioner's Traverse to Respondents Opposition to Petitioner's
Petition for a Writ of Habeas Corpus, and for the reasons stated
in the Petitioner's Traverse, it is hereby

    **ORDERED** that the Writ of Habeas Corpus herein be and the same
is hereby sustained, and that the Petitioner be and he hereby is
discharged from custody.

    SO ORDERED, this_____day of_____,2008.


                            _____
                            Henry H. Kennedy, Jr/
                            U.S. District Court Judge

Copies to:

Sherri L. Berthrong
Assistant United States Attorney
Special Proceedings Division
555 4th Street, N.W., Room 10-450
Washington, D.C. 20530

Melvin Crosby Bey
Reg. No. 01366-000
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986-0630